# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## MOBILE DIVISION

| | | |
|---|---|---|
| _____, | ) | |
| _____ | ) | |
| | ) | |
| **Plaintiff-Relator,** | ) | |
| | ) | |
| **v.** | ) | **Case No.** _____ |
| | ) | **Filed Under Seal** |
| _____ | ) | **Pursuant To** |
| _____ | ) | **31 U.S.C. § 3730(b)(2)** |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT OF THE UNITED STATES

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
MOBILE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.,* ) | | |
| ANIKKA BOLDEN, ) | | |
| ) | | |
| **Plaintiff-Relator,** ) | | |
| ) | | |
| v. ) | **Case No.** _____ | |
| ) | **Filed Under Seal** | |
| ALTAPOINTE HEALTH SYSTEMS and ) | **Pursuant To 31 U.S.C. § 3730(b)(2)** | |
| BAYPOINTE BEHAVIORAL HEALTH ) | | |
| HOSPITAL, ) | | |
| ) | | |
| **Defendants.** ) | | |

## COMPLAINT OF THE UNITED STATES

The United States of America (the "Government"), by and through its *qui tam* Relator, Anikka Bolden ("Relator"), bring this action under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "False Claims Act" or "FCA"), against defendants AltaPointe Health Systems ("AltaPointe") and BayPointe Behavioral Health Hospital ("BayPointe" or the "facility") (BayPointe and AltaPointe are collectively referred to herein as "Defendants" or the "Company") to recover all damages, penalties, and other remedies provided by the False Claims Act, and for their complaint ("Complaint") allege:

1.      Based on Relator's personal knowledge and further investigation, sufficient evidence exists to allege that Defendants have violated and continue to violate the False Claims Act by submitting fraudulent bills to the Government (and/or through its conduct in causing others to submit fraudulent bills to the Government) as a result of: (1) billing Government health care programs for unprovided therapy services; (2) double billing for patient beds; (3) failing to follow patients' plans of care; (4) admitting ineligible patients; (5) unlawfully extending patient stays; and (6) housing sexual predators in the same facility as their adolescent patients.

1

## PARTIES

2.        Relator Anikka Bolden served as an admission unit clerk at BayPointe in Mobile, Alabama from January 4, 2014 to January 8, 2015.  Relator was one of the only clerical employees at BayPointe during the night shift, which typically ended around 8:00 am.  At BayPointe, Relator was responsible for handling paperwork associated with patient admissions.  In many instances, this required Relator to process patient insurance information.  Relator was also responsible for medical records quality, which required Relator to ensure that all progress notes were submitted and paperwork was signed.  During her employment, Relator reported to health information coordinator Demetrius Arrington, who answered to Tonya Baker, administrator over BayPointe and its sister facility EastPointe Behavioral Health ("EastPointe") (discussed below).

3.        Plaintiff United States, acting through the Department of Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled, established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* ("Medicare").

4.        BayPointe, located in Mobile, Alabama, is a mental health facility for adolescents that is divided into three units: residential, inpatient (referred to as the "hospital"), and the Lemoyne School. The residential side has approximately fifty beds, largely serving special needs/disciplinary problem children waiting to be adopted or go to a group home.  The hospital side has approximately fifty-five beds and operates as a typical inpatient hospital for children.  According to Relator, it is not unusual for children to spend time on both the residential and inpatient sides of BayPointe.  The Lemoyne School, located at BayPointe, provides education from kindergarten through high school for children with disciplinary issues.  Relator understands that almost all of BayPointe's patients are insured through Government health care programs.

Specifically, Relator estimates that 75% of BayPointe's patients are Medicaid recipients, 20% are insured through All Kids, and the remaining 5% are insured through either TRICARE or private insurance.

5.     Relator states that during her time at BayPointe, the facility was significantly understaffed.  According to Relator, BayPointe's own internal policies require that there be one behavioral aide for every four patients.  However, according to Relator, each behavioral aide had approximately seven or eight patients.  This was no happenstance. For example, on days where the BayPointe facility had the required number of staff, personnel would be sent home.  This led to constant patient escapes from the facility.  Moreover, Relator states that the facility was also normally short on nurses.

6.     Among its holdings, AltaPointe owns BayPointe and its sister facility for adult patients, EastPointe.  According to its website, AltaPointe is: "Alabama's largest and most comprehensive behavioral healthcare and psychiatric hospital system and the second largest in the southeastern US."  AltaPointe consists of: 1,350 employees; an $82 million budget; one children's psychiatric hospital; one children's residential facility; two adult psychiatric hospitals; two private counseling practice locations; ten outpatient service locations; twenty-five adult residential group homes; nine adult foster homes; two adolescent transitional age homes; 314 licensed and certified professionals; twenty psychiatrists; fifteen psychiatric residents; twelve psychiatric nurse practitioners; and 22,985 total patients served.

## JURISDICTION AND VENUE

7.     Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

8.     The Court may exercise personal jurisdiction over the Defendants, and venue is

proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. § 3729 *et seq.*, and complained of herein took place in part in this District and the Defendants transacted business in this District as described herein.

9. Pursuant to 31 U.S.C. § 3730(b)(2), Relator prepared and will serve the Complaint on the Attorney General of the United States, and the United States Attorney for the Southern District of Alabama, as well as a statement of all material evidence and information currently in her possession and of which she is the original source. These disclosure statements are supported by material evidence known to the Relator at the time of filing establishing the existence of Defendants' false claims. Because the statements include attorney-client communications and work product of Relator's attorneys, and will be submitted to those federal officials in their capacity as potential co-counsel in the litigation, Relator understands these disclosures to be confidential and exempt from disclosure under the Freedom of Information Act. 5 U.S.C. § 552; 31 U.S.C. § 3729(c).

## LEGAL BACKGROUND

### *The False Claims Act*

10. The False Claims Act provides, in pertinent part:

(a) Liability for Certain Acts.—

(1) In general.— Subject to paragraph (2), any person who—

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

> (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(3) Costs of civil actions.— A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b) Definitions.— For purposes of this section—

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

(2) the term "claim"—

5

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

11.   Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 28 C.F.R. § 85.1, False Claims Act civil penalties were increased from $5,000 to $11,000 for violations occurring on or after September 29, 1999.

## FACTUAL BACKGROUND

## I.   Overview of Medicaid And Its Benefits

12.   Medicaid is a joint federal-state program created in 1965 that provides health care

benefits for certain groups, primarily the poor and disabled. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Among the states, the FMAP is at least 50 percent and is as high as 83 percent.

13.     The Medicaid program pays for services pursuant to plans developed by the states and approved by the HHS Secretary through CMS. 42 U.S.C. § 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. 42 U.S.C. §§ 1396b(a)(1), 1903(a)(1). The federal Government then pays each state a statutorily-established share of "the total amount expended . . . as medical assistance under the State plan . . . ." 42 U.S.C. § 1396b(a)(1). This federal-to-state payment is known as federal financial participation.

14.     As a prerequisite to participating in state Medicaid programs, providers must expressly certify (or, through their participation in the state-funded health care program, impliedly certify) their compliance with federal and state laws governing Medicaid, including the federal Anti-Kickback Statute.

15.     In order to be reimbursable by Alabama Medicaid, recipients seeking admission to a psychiatric hospital must require psychiatric services that can only be provided on an inpatient basis. Ala. Admin. Code 560-x-41-.09. In addition, all Medicaid recipients seeking admission to a residential treatment facility shall require continuous and active psychiatric treatment and care. Ala. Admin. Code 560-x-41-.13. These psychiatric services must involve the implementation of a professionally developed and supervised individualized plan of care. Ala. Admin. Code 560-x-41-.09.

16.     Moreover, prior to admission to a psychiatric facility or before authorization for

payment, the attending physician or staff physician must make a medical evaluation of each recipient's need for care in the facility and appropriate professional personnel must make a psychiatric and social evaluation. Ala. Admin. Code 560-x-41-.05. The psychiatric evaluation must be completed within 60 days of admission. *Id.*

17.     Under Alabama's Medicaid benefit, inpatient psychiatric services are only covered if they involve "active treatment." Ala. Admin. Code 560-x-41-.06. Active treatment is defined as the implementation of a professionally developed and supervised individualized plan of care that is: (a) Developed and implemented no later than 14 working days after admission, and (b) Designed to achieve the recipient's discharge from inpatient status at the earliest possible time. *Id.* At least one professional member of the interdisciplinary treatment team must be involved in providing active intervention for an unresolved or active problem as noted on the plan of care. Ala. Admin. Code 560-x-41-.09(3).

## II.     The Alabama ALL Kids Program

18.     ALL Kids is a Children's Health Insurance Program ("CHIP") that provides low-cost healthcare coverage for Alabama's children and teens whose families' income is above Medicaid eligibility, but below 300 percent of the federal poverty level. Since its beginnings as the first CHIP program in the United States in 1998, ALL Kids has insured over a quarter million kids in Alabama. In 2009, ALL Kids paid $147,000,000 in benefits. In 2010, ALL Kids insured 75,112 children in Alabama. ALL Kids is administered by the Alabama Department of Public Health.

19.     ALL Kids comprehensive benefit package covers regular check-ups, immunizations, sick child doctor visits, prescriptions, dental and vision care, hospital and physician services, and mental health and substance abuse services. Depending on the child's

family's income, the beneficiary may be responsible for small premiums and co-payments. ALL Kids uses Blue Cross Blue Shield of Alabama to provide medical, mental health and substance abuse services through their preferred provider network.

20.     In order to be eligible for ALL Kids health insurance, the child must be: (1) under the age of 19; (2) a U.S. citizen or an eligible immigrant; (3) not covered by other insurance; (4) not a resident of an institution; and (5) not covered by or eligible for Medicaid. In addition, to receive health insurance through ALL Kids, the child's parents must meet an income requirement, stated above.

## III.   The TRICARE Program

21.     TRICARE, formerly known as Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), is a managed health care program established by the United States Department of Defense. 10 U.S.C. §§ 1071-1110. TRICARE provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents. TRICARE contracts with fiscal intermediaries and managed care contractors to review and pay claims, including claims submitted by the Defendants.

## IV.   Defendants' Wrongful Conduct

22.     Defendants have engaged in longstanding fraudulent conduct in violation of the laws and regulations stated above, resulting in a substantial, actual loss to the Government. Specifically, Defendants: (1) billed Government health care programs for unprovided therapy services; (2) double billed for patient beds; (3) failed to follow patients' plans of care; (4) admitted ineligible patients; (5) unlawfully extended patient stays; and (6) housed sexual predators in the same facility as their adolescent patients. Defendants' fraud has caused the submission of false or fraudulent claims for payment which have caused monetary damages to the Government.

## A.    Defendants Bill for Unprovided Therapy Services

23.    Defendants regularly bill Government health care programs for therapy services that were either never provided or, if they were provided, could not be considered "therapy" under any reasonable interpretation of the word.  First, the "therapy" that BayPointe purports to provide its patients is, in reality, nothing more than mindless activities intended to keep patients occupied during the day.  Indeed, BayPointe bills Government health care programs for therapy services when they contain no therapeutic component.  For example, many of the "therapy" sessions provided by Defendants merely consist of providing the children "coloring sheets" (*i.e.*, Xeroxed pages from coloring books) and crayons.  Moreover, BayPointe also puts on movies for their adolescent patients to watch during their therapy sessions.  In such instances, the therapist's only responsibilities are handing out the coloring sheets and crayons or starting the movie.  True to form, Defendants bill Government health care programs for the provision of "therapy" services, despite the fact that such activities are what one would expect from a sub-par daycare center.

24.    BayPointe also bills Government health care programs for individual therapy sessions that were provided in a group setting in order to increase its reimbursement.  BayPointe's patients all have individualized plans of care which state the treatment they require while under BayPointe's care.  Depending on the needs of the child, the plan of care may require that a child receive individualized therapy sessions to treat his or her medical condition.  Therapy sessions provided on a one-on-one basis are reimbursed at a higher rate than group therapy sessions.  According to Relator, many patients receiving treatment at BayPointe have plans of care that mandate that they receive individual therapy sessions.  BayPointe, however, regularly provided its patients, whose plans of care require that they receive individualized therapy sessions, therapy in a group setting.  Defendants would then bill for individual therapy to increase their reimbursement

from Government health care programs. Moreover, BayPointe was extremely short-staffed, and by billing for individual therapy, while providing group therapy, BayPointe maximized the revenue it was able to derive from its depleted staff.

25.     In other instances, BayPointe simply falsified their reports to show that therapy had been provided when, in fact, it was not. According to Relator, BayPointe therapists would conduct therapy sessions for merely a few minutes, which mainly consisted of pulling the child aside and asking how they were feeling. However, when it came time to bill for these "therapy" sessions, BayPointe would state that it provided a full hour of therapy services to the child. If a therapy session lasted longer than a few minutes, BayPointe would bill for two hours of therapy services. According to Relator, therapy sessions that were billed for two hours rarely, if ever, lasted longer than a half hour.

26.     BayPointe also falsified the type of therapy session it provided to its adolescent patients. Alabama's Medicaid benefit provides reimbursement for family therapy sessions. Family therapy sessions are when the mental health provider brings in the patient's family and conducts a joint therapy session with the patient and his or her family. The goals of family therapy sessions are to help the family accept the patient's mental disorder and assist them in dealing with any challenges. According to Relator, many of BayPointe's patients were in foster homes or were otherwise in the custodianship of the State of Alabama. In other words, these patients did not have families to come in for family therapy sessions. However, something as insignificant as not having a family did not prevent BayPointe from billing Government health care programs for family therapy sessions for such patients. According to Relator, for patients that did not have families, BayPointe would conduct "family" therapy sessions with only the patient. In other instances, the child's state assigned agent would come to the facility for a few minutes, simply to fill out the

paperwork stating that they were there, and then leave. Despite the fact that the patient's family did not attend the therapy session, nor did the state agent, BayPointe would nonetheless bill Government health care programs for providing family therapy sessions.

### B.   Defendants Double Bill for Patient Rooms

27.   According to Relator, BayPointe almost always failed to follow patients' plans of care requiring that they have their own room, and instead placed them in a room with a roommate. BayPointe places patients, whose plans of care require that they receive a single room (*i.e.*, no roommate), in rooms with other patients so it can double bill Government health care programs for its beneficiaries. Alabama's Medicaid benefit pays for patients' beds in a psychiatric facility (as opposed to rooms). According to Relator, many patients have plans of care that require that the patient have their own room. However, BayPointe only has double rooms and in almost all cases patients who were required to receive private rooms were given a roommate.

28.   Thus, in instances where patients' plans of care required that they have their own room, Government health care programs would pay for the patient's bed, as well as the unused bed. For example, if a patient's plan of care requires that they have their own room, BayPointe would put the child in a room with a roommate. Then, BayPointe would bill Government health care programs for two beds for that patient, as well as the bed for their roommate. Thus, by disregarding patients' plans of care, BayPointe is able to bill for three beds, despite only using two.[1]

---

[1]      To provide an example of how this scheme works, suppose that BayPointe has fifty beds in twenty-five rooms (*i.e.*, two beds per room). Fifteen of those rooms have two patients, as allowed by their plans of care. For these thirty patients, Defendants are reimbursed at the shared room rate. Further suppose that BayPointe has ten patients whose plans of care require that they have their own room. For these patients, Defendants are reimbursed at the private room rate (approximately double the shared room rate). However, in order to maximize revenue, BayPointe places an additional patient in each private room. For these patients, Defendants are reimbursed

29.     According to Relator, BayPointe management told its staff that it would attempt to prevent any problems which could arise from double rooming all patients by increasing its staff. However, the promised increase in staffing rarely occurred. This led to many problems ranging from boys having sex with each other to fights between patients resulting in injuries to patients and staff.

### C.     BayPointe Admitted Ineligible Patients

30.     According to Relator, BayPointe regularly admitted patients who did not meet the eligibility requirements for Government health care reimbursement. It is well known in the community served by BayPointe that if parents wanted to get rid of their kids, or wanted to teach them a lesson, they could bring them to BayPointe. According to Relator, when this happened, BayPointe would almost always admit the patient, regardless of the child's condition.

31.     According to Relator, a lot of parents would bring their children to BayPointe for things such as having sex, smoking pot, or failing to come home over the weekend. Indeed, the foregoing mundane conduct is not atypical of teenagers. However, BayPointe always found a way to admit these patients, regardless of how harmless their behavior. For example, one parent brought his son to BayPointe because he was gay. In another instance, a young girl broke up with her boyfriend, and her parents brought her to BayPointe so she could get away from him. In both instances, the children were admitted.

32.     It is also well known in the surrounding community that parents could get free drugs by admitting their children to BayPointe. According to Relator, when a child was discharged from

---

at the shared room rate. Therefore, by engaging in this scheme, Defendants are able to bill for sixty beds when there are only fifty actual beds (*i.e.*, BayPointe bills for thirty beds for the patients assigned to double rooms; twenty beds for patients who require private rooms; and ten beds for patients assigned to private rooms). As almost all of BayPointe's patients are Medicaid beneficiaries, the Government foots the bill for Defendants' fraud.

BayPointe, they would almost always be provided a prescription for medication. The prescriptions given to discharged patients were for drugs that could be abused and/or sold. This served as an inducement which Defendants provided to parents to admit their children to BayPointe, in violation of the federal Anti-Kickback Statute. According to Relator, in many instances, the prescriptions provided to the discharged child would be taken or sold by their parents. Once their parents took or sold all of the child's medication, they would readmit the child in order to receive another prescription upon subsequent discharge.[2]

33.    BayPointe also admitted "frequent flyers" who did not meet the admission requirements for psychiatric treatment. According to Relator, there were some patients that were constantly being admitted and discharged from BayPointe. In some instances, these patients had been admitted to BayPointe over twenty times. According to Relator, BayPointe continuously admitted these patients regardless of their condition. In addition, BayPointe staff would add fabricated diagnoses to justify these admissions.

34.    BayPointe also admitted ineligible patients through its crisis line. BayPointe had a crisis line that parents and children could call in case of an emergency. When a parent or child called, a BayPointe representative would first discuss the potential patient's insurance information. After determining that the caller's insurance would cover a stay, they would instruct the caller to come to the facility for an evaluation. When the potential patient arrived at the facility, a BayPointe nurse would perform an evaluation. After completing the evaluation, the nurse would call a BayPointe physician to report the findings of the evaluation. The physician would then

---

[2]    According to Relator, upon discharge, patients were automatically scheduled for a follow up visit with an AltaPointe physician. Moreover, discharged patients were only permitted to use their own physician for a follow up visit if they had a preexisting relationship with the physician prior to being admitted.

instruct the nurse whether or not to admit the patient. According to Relator, no matter what the results of the evaluation were, the patient was almost always admitted.

35.     Moreover, according to Relator, after a crisis line evaluation, new nurses would chart their notes accurately, as described by the patient. Nurses who were not new to BayPointe, however, would falsify their notes to make the patient's medical condition appear worse in order to justify admissions.

36.     In addition to admitting ineligible patients, BayPointe's recruitment of patients through its crisis line also violated the Alabama Medicaid patient admission requirements. Although Alabama's Medicaid program does allow for different requirements in the case of an "emergency admission," most of the patients admitted through the crisis line did not qualify as an emergency admission under Alabama's Medicaid regulations. *See* Ala. Admin. Code 560-x-41-.04 (stating "an emergency admission is described as a situation where the patient's condition is such that prompt provision of care is necessary to prevent the death or serious impairment of the health of the patient or others due to the individual's psychiatric condition.").

**D.    BayPointe Unlawfully Extended Patient Stays**

37.     According to Relator, BayPointe unlawfully extended patients' stays by exaggerating their medical conditions. For example, Strickland Youth Center ("Strickland"), a juvenile detention facility in Mobile, Alabama, would have a "dump day" where they would drop children off at BayPointe to be evaluated. According to Relator, after the evaluation, BayPointe was supposed to keep the child for three to five days. However, BayPointe would keep them a lot longer, typically twelve days to a month, by fabricating their conditions. For example, BayPointe would exaggerate basic problems experienced by many young adults (*e.g.*, they are unpopular, their girlfriend broke up with them, etc.) in order to unlawfully extend the patients length of stay

in the facility.  In many instances, BayPointe would simply say (falsely) that the child has a mental disorder and requires medication and an extended stay at its facility.  According to Relator, this scheme was easily accomplished because most, if not all, of the patients from Strickland did not have parents, a family, or anyone else in their corner to ensure that they received proper care and were not abused.  Therefore, BayPointe did not have to answer to anyone who might raise concerns about unnecessarily extending the child's stay.  As a result, BayPointe regularly fabricated patients' conditions to extend their stay at the facility.

38.     In instances where a child's parents brought the patient to BayPointe, their length of stay would also be unlawfully extended.  According to Relator, when a parent admitted their child to BayPointe, they were told that their child would be discharged in three to seven days.  However, BayPointe regularly extended the patient's stay to twelve days to a month.  According to Relator, some parents allowed their child to stay at the facility until BayPointe permitted discharge.  However, if a parent wanted to discharge their child prior to BayPointe's determination that discharge was appropriate, they would have to do so "against medical advice."

39.     Moreover, Relator states that some children have been in BayPointe's care for years, and are basically shipped from facility to facility.  According to Relator, some of these children did have serious issues.  However, every time one of these patients was set for discharge, BayPointe staff would find a reason to deny discharge.

### E.     BayPointe Endangered Children by Housing Sexual Predators with Its Adolescent Patients

40.     According to Relator, Defendants place adult patients from their EastPointe facility in with its adolescent patients at BayPointe.  EastPointe is an adult-only mental health facility owned by AltaPointe.  During Relator's employment with BayPointe, the EastPointe facility became overcrowded.  To free up space, Defendants would bring "nonviolent" patients from the

EastPointe facility to the BayPointe facility. However, some of these patients from EastPointe were sex offenders with court orders to stay away from children and schools. Despite the court orders, Defendants regularly housed sexual predators in the BayPointe facility, which, in addition to the mental health facility for children, also contained the Lemoyne School, a school for kids in kindergarten through high school. Indeed, according to Relator, only a set of double doors separated these dangerous sex offenders from BayPointe's adolescent patients. Further, according to Relator, her former BayPointe co-workers informed her, in early 2016, that Defendants are still housing "non-violent" adults at BayPointe.

**F.   BayPointe Has Student Interns Provide Treatment to Its Patients**

41.     BayPointe student interns, rather than physicians, provide a lot of the treatment to patients. Relator is aware of this conduct because (1) as part of her job she was charged with reviewing the entries submitted by student interns and (2) she could see virtually all the patient rooms from her desk. For example, part of Relator's job responsibilities included reviewing inpatient documentation to ensure that the required visits were made, particularly the patient/physician encounter required by Medicaid. According to Relator, student interns working at BayPointe would regularly perform the patient/physician encounter, as well as conduct daily patient examinations. Typically, this involved asking the patient a set of boilerplate questions and preparing the progress note. The progress note was then provided to the physicians to sign off on. The student interns would then input their own chart entries into BayPointe's electronic health record system, but would leave them in draft form. Then, often the next day, a BayPointe physician would finalize the note. BayPointe physicians could finalize the note at the facility or from home by logging in remotely, thereby causing Defendants to bill under the physician's name.

42.     According to Relator, these encounters and examinations would typically take

about fifteen minutes. Nevertheless, BayPointe's physicians bill for one hour for each encounter performed by the student interns. According to Relator, most of BayPointe's physicians leave the facility at 2:00 pm every day. Thus, in many instances, Defendants are billing for one hour of the physician's time when they are not even at the facility. According to Relator, Drs. MD1, MD2, and MD3 regularly engaged in this conduct.[3]

<u>COUNT I</u>
(False Claims Act, 31 U.S.C. § 3729 *et seq.*)

43.     Relator repeats each allegation in each of the proceeding paragraphs of this Complaint with the same force and effect as if set forth herein.

44.     As described above, Defendants have submitted and/or caused to be submitted false or fraudulent claims and bills to the Government (and/or through its conduct in causing others to submit fraudulent bills to the Government) as a result of: (1) billing Government health care programs for unprovided therapy services; (2) double billing for patient beds; (3) failing to follow patients' plans of care; (4) admitting ineligible patients; (5) unlawfully extending patient stays; and (6) housing sexual predators in the same facility as their adolescent patients.

45.     By virtue of the acts described above, Defendants have violated:

(1)     31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

(2)     31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

(3)     31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or

---

[3]     Relator almost never saw MD3 during her employment with BayPointe. Relator states that MD3 performed all of his responsibilities (*e.g.*, patient encounters, chart entries) through his nurse practitioner, other nurses, or remotely from his home.

property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

46.     To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relator realleges that Defendants knowingly violated 31 U.S.C. §§ 3729(a)(1)-(2) and (a)(7) prior to amendment, by engaging in the above-described conduct.

47.     By reason of the foregoing, the Government has suffered actual damages and is entitle to recover treble damages plus a civil monetary penalty for each false claim.

WHEREFORE, Relator prays that the Court enter judgment against Defendants as follows:

(a)     that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, provides;

(b)     that civil penalties of $11,000 be imposed for each and every false claim that Defendants caused to be presented to the United States and/or its grantees, and for each false record or statement that Defendants made, used, or caused to be made or used that was material to a false or fraudulent claim;

(c)     that attorneys' fees, costs, and expenses that Relator necessarily incurred in bringing and pressing this case be awarded;

(d)     that Relator be awarded the maximum amount allowed to them pursuant to the False Claims Act; and

(e)     that this Court order such other and further relief as it deems proper.

## JURY TRIAL DEMANDED

48.     Relator demands a jury trial.

DATED: July 5, 2016                    Respectfully submitted,

D. Anthony Mastando (ASB-0893-X32B)
MASTANDO & ARTRIP, LLC
301 Washington St. NW, Ste. 302
Huntsville, AL 35801
Telephone: (256) 532-2222
Facsimile: (256) 513-7489
tony@MastandoArtrip.com

**THE WEISER LAW FIRM, P.C.**
CHRISTOPHER L. NELSON
CLN@WEISERLAWFIRM.COM
JAMES M. FICARO
JMF@WEISERLAWFIRM.COM
ROSS M. WOLFE
RMW@WEISERLAWFIRM.COM
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062

*Attorneys for Relator*